# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELDEE L. COLEMAN, | ) 1:08-cv-00299 GSA |
| | ) |
| | ) |
| | ) ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **BACKGROUND**

Plaintiff Eldee L. Coleman ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On December 24, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

# FACTS AND PRIOR PROCEEDINGS[2]

On or about September 7, 2005, Plaintiff filed an application alleging disability since March 9, 2004, due primarily to schizophrenia, paranoia, bleeding ulcers, severe chronic back and leg pain, abdominal cramps, and auditory hallucinations. AR 83-89, 91.[3] His application was denied initially and on reconsideration, and Plaintiff thereafter requested a hearing before an Administrative Law Judge (ALJ). AR 26-27, 54-68, 75-78. ALJ Christopher Larsen held a hearing on May 16, 2007, and issued an order denying benefits on June 13, 2007. AR 19-25, 330-346. On December 28, 2007, the Appeals Council denied review. AR 5-7.

Hearing Testimony

ALJ Larsen held a hearing on May 16, 2007, in Fresno, California. Plaintiff appeared and was represented by Richard S. Hundal, an appointed non-attorney representative. Vocational Expert (VE) Kenneth Ferra appeared telephonically and testified. AR 330; see also AR 54.

Plaintiff testified that he completed the seventh or eighth grade. AR 340. In response to a question about any medication he takes for a psychotic disorder not otherwise specified, Plaintiff testified that he is aware of the purpose for some of the prescription medications that he takes, but as to others, he is not certain. He could not specifically identify a medication to treat his psychiatric disorder. AR 336.

Plaintiff testified that his knee problems began when he "went through a glass window." He did not undergo surgery following this incident, rather he was treated with steroid injections. AR 336-337. The injections did not resolve the pain, and Plaintiff believed it was necessary for the doctor to try the injection treatment before making a determination regarding possible surgery. AR 337. Plaintiff was using a cane at the time of the hearing, and indicated that the cane was prescribed by "[t]he therapist." AR 337. Plaintiff testified that without a brace, he cannot stand for long. When he is wearing the brace, Plaintiff can stand for about fifteen minutes. AR 337-338.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] In an undated Disability Report Adult, Plaintiff indicated he "became unable to work" in "1989." AR 91.

2

With regard to the degenerative disc disease, Plaintiff described pain in his lower back as "pressure" and "somebody hit[ting] me with a baseball bat or something." He takes Vicodin for the pain. AR 338. Plaintiff indicated that he is treated at University Medical Center (UMC) for diabetes, as well as for symptoms concerning his back and legs. AR 339.

When Plaintiff was asked whether Dr. Ky[4] was his regular treating physician, he was not certain. Plaintiff said he had "had so many different doctors." AR 338-339. Plaintiff believed Dr. Ky was at University Medical Center, but he did not know how many times he may have been seen by Dr. Ky. Plaintiff thought however that he had seen Dr. Dizon[5] for almost a year. AR 340.

VE Kenneth Ferra indicated that he has testified as an expert approximately 3,000 times in the past four years. AR 341. For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and past work experience. This person could sit down and walk for a period of one hour, and stand for a period of three hours. The person should also stand every thirty minutes for about five minutes, and should not sit continuously throughout the workday. He can lift and carry 50 pounds occasionally, 25 pounds frequently, and he must have four unscheduled ten-minute breaks per day. He can never push, pull, kneel, bend or stoop. The VE testified that this person could not perform any work in the regional or national economy. AR 342.

In the second hypothetical, the ALJ asked the VE to assume a person of the same age, education and work experience, who can lift and carry 50 pounds occasionally, 25 pounds frequently, and can stand, walk and sit for six hours. Also, the person must use an assisted device to walk and stand, but can occasionally climb, balance, crawl, stoop, kneel and crouch. The VE testified that this person could perform sedentary work, such as cashier and cashier II, and assembler, positions. There are approximately 12,000 such jobs in California. AR 343-344.

---

[4]The ALJ and the parties refer to the physician as Dr. Kay, however, the signature that appears on the last page of the form appears to read "Ky" (AR 318), the UMC Outpatient Registration of the same date refers to the primary physician as "Ky, Leng" (AR 319), and the signature appears to coincide with that seen on treatment records for September 26 and October 24, 2006 (*see* AR 240, 251). Thus, the Court will refer to the physician as Leng Ky.

[5]"Dr. DiSohn" appears in the transcript of the hearing, however, the medical records reference a Dr. Dominic Dizon. *See* AR 165, 271, 280-282.

In the last hypothetical, the ALJ asked the VE what would happen in the assisted device restriction was removed, and the VE testified that "you'd be turning down access to a full range of cashiers here in addition to, . . . other occupations that would be compatible with the hypothetical . . .." AR 344.

During examination by Plaintiff's representative, the VE was asked to consider the difficulty that Plaintiff has interacting appropriately with others, including the general public and coworkers, due to a personality disorder. The VE then asked what was meant by his use of the word "difficulty," and the representative replied that "if it's an eight-hour day, I would, I would, you know, cut that at least by two or three hours per day, because of his anti-social personality." The VE testified that such a difficulty would not preclude such a person from working as a cashier or assembly person. AR 344.

Medical Record

On December 18, 2003, Paul D. Casner, M.D., performed a comprehensive internal medicine evaluation of Plaintiff. AR 168-171. Plaintiff's chief complaints were back pain from the neck down, and knee pain, greater in the right knee. AR 168. Plaintiff reported that he injured his back falling from a loading dock at the age of seventeen, and reported "pain in the back in the 1980's, requiring sutures." *Id.* His left knee was injured in a motorcycle accident in the 1980's and his right knee was injured soon thereafter "when he put it through a window." *Id.* Plaintiff reported he could sit for about twenty minutes, stand for about five minutes, and walk about a block, before pain limited those abilities. He does not drive, and last worked at a car wash in 2001. AR 168-169. Plaintiff indicated he was not taking any medication at that time, and indicated his past medical history involved hypertension and paranoid schizophrenia. He also indicated there is a family history of diabetes, hypertension and heart disease. AR 169. Dr. Casner noted that Plaintiff was well-groomed, articulate and in no acute distress. His affect was broad and his mood was appropriate. AR 169. The physical examination notes include a comment that "claimant appeared to walk slowly, with a wide-based limp," but that he could sit comfortably and get off and on the examination table without assistance. AR 169. Range of motion findings include "no joint discoloration or deformity . . . no objective evidence of any

4

inflammation of the joints." His motor strength was normal, and while heel and tandem walking were "a bit awkward," it remained within normal limits. AR 169-170. Dr. Casner indicated that Plaintiff's report of progressive pain in the spine and knees is consistent with degenerative arthrosis. It was noted that Plaintiff faced a cardiovascular risk with untreated hypertension, possible diabetes and dyslipidemia, particularly in light of his family history, sedentary lifestyle and obesity. The doctor noted that while psychiatric conditions were not discussed, such conditions "may be as limiting as the claimant's physical complaints." AR 171. Dr. Casner concluded that Plaintiff could stand and walk about two hours in an eight-hour workday, due to pain in the back and legs, coupled with poor aerobic capacity due to cardiovascular and lung disease. The doctor found Plaintiff could sit without restriction in an eight-hour workday, provided he received a break every two hours. Plaintiff required no assistive device. Plaintiff could lift and carry twenty pounds frequently. Postural limitations included occasional forward bending, stooping, squatting, and kneeling due to pain in the back and knees. An environmental limitation due to that pain included limitations regarding walking distances and the use of stairs. AR 171.

On December 29, 2003, Plaintiff underwent a comprehensive mental status and psychological examination by Charles House, Ph.D., FACAP. AR 172-179. Plaintiff presented on time, and was well-dressed and well-groomed. AR 172, 174. Plaintiff's chief complaints, as indicated to Dr. House, were that he suffers from "'memory loss,'" and he "'cannot take care of [him]self'" or "'gainfully take care of [his] well-being.'" AR 173. He reported continuous anxiety and nervousness, and stated he had a panic disorder. He denied depression, suicidal ideation or anhedonia. AR 173. Plaintiff stated he had difficulty sleeping through the night without waking. He has difficulty managing anger, has difficulty with authority and argues with those who try to control his behavior, and has a criminal history that involves four driving under the influence convictions with subsequent incarceration. AR 173. While Plaintiff reported that he had difficulty paying attention and with memory, he was unable to provide specifics in response the doctor's inquiries. AR 173. Plaintiff reported to Dr. House that he heard "'men's voices telling [him] to do things,'" including drinking and telling him to jump from a window.

Plaintiff indicated he hears voices "'almost every day'" and had for the past ten to fifteen years. He reported that he is not bothered by the voices, and he sometimes does not pay attention to them. AR 173. Plaintiff reported physical problems including back and knee problems, balance problems, stomach cramps, and a history of blood in his stool. When asked how long he has suffered from his physical complaints, he indicated an onset in 1989, but was unable to tell the doctor what specific event or series of events led to the problems. AR 173.

Plaintiff told Dr. House that he could not work because he "'can't remember good enough,'" his body ached everywhere and he did not get along well with others. AR 173. Plaintiff denied a history of psychiatric intervention and indicated he was not taking any psychotropic medication. AR 173. He admitted a past history of drug and alcohol abuse, indicating he "tried 'everything,'" but did not require treatment for alcohol or drug abuse. He had been sober for one year. AR 174.

Plaintiff reported that he had been married once before, but it ended in divorce. He has five children, all of whom live elsewhere. He lives with his girlfriend currently. He completed the seventh grade, but no further education. His work history involves working as a laborer at Rainbow Car Wash and Zacky Farms. With regard to Zacky Farms, Plaintiff stated he worked there for three days before being fired for not following directions. AR 174.

A typical day for Plaintiff involves showering, eating breakfast, watching television, and napping. He sometimes helps out around the house with clean up, dishes and sweeping. He attends church occasionally and visits with friends. AR 174.

Dr. House found Plaintiff to be emotionally guarded, with an indifferent and "somewhat menacing" attitude. AR 174. Plaintiff's thinking was "organized and logical," and his "mental activity [was] linear and goal directed." AR 174. The doctor noted that while Plaintiff alleged schizophrenia and paranoia, those symptoms were not present during the evaluation. His thinking was "not characterized by loosened associations, magical thinking or circumstantiality." Plaintiff did describe people "'who may be out to get him,'" but the doctor doubted the validity of the statement because Plaintiff's presentation was not convincing. AR 175.

Dr. House administered psychological testing. The REY 15 indicated a high probability for malingering or purposeful error, as did the TOMM and TMT tests. As a result, the data was considered to be invalid. AR 175. The Wechsler Adult Intelligence Scale III was administered, and resulted in a full scale IQ of 65, indicating mild retardation. However, Dr. House considered the findings invalid as well because Plaintiff committed purposeful errors, and those errors are suggestive of "a level of intellectual functioning significantly higher than retardation." AR 176.

The Bender-Gestalt Diagnostic was considered invalid due to Plaintiff's attempts to "skew data," but Dr. House did indicate that a diagnosis of central nervous system damage should be considered. AR 176. The Wechsler Memory Scale III and Folstein Mini-Mental Status were also invalid due to Plaintiff's malingering and conscious attempts to skew the data. AR 176-177.

Dr. House believed Plaintiff's intellectual level fell in the dull normal to high borderline range based upon Plaintiff's vocabulary and general cognitive functioning. AR 178. His clinical observations led him to conclude that Plaintiff could maintain adequate concentration, and that his memory was intact and functional. AR 179. It was noted that Plaintiff's social skills are impaired. AR 178. Dr. House's DSM-IV diagnoses included: a poly substance abuse disorder in Axis I; personality disorder with antisocial and paranoid traits in Axis II; a lengthy history of substance abuse, medical problems and a personality disorder in Axis IV; as well as a GAF score between 50 to 55 in Axis V. AR 178.

Dr. House concluded that Plaintiff would be capable of managing funds should SSI be awarded, and could perform simple, repetitive tasks, and maintain regular attendance in a workplace. AR 178-179. It was noted that Plaintiff may experience difficulty in the following areas due to his personality disorder: performing complex and detailed tasks, accepting supervision, interacting with coworkers and the general public, and completing a normal workday. AR 179.

A psychiatric review completed by Archimedes Garcia, M.D., on January 23, 2004, found no severe impairment of a schizophrenic, paranoid or other psychotic type disorder. AR 180. Those review findings were echoed by James V. Glaser, M.D., on July 27, 2004. AR 180.

7

On March 7, 2004, Plaintiff complained of blurry vision, dehydration, polydipsia and lower abdominal pain in the emergency room at University Medical Center (UMC).  AR 198. Nurse notes indicate laboratory results established a "critical glucose value," and Plaintiff was admitted for treatment.  AR 199; see also AR 200-205, 302-309.  Relatedly, x-rays of Plaintiff's chest on March 8, 2004, ruled out pneumonia.  AR 194.  A UMC laboratory report dated March 9, 2004, indicates elevated glucose and ALT/AST levels, among others.  AR 191.

On March 23, 2004, Plaintiff was seen at Sierra Adult Health Clinic (SAHC) for follow up after his admission to the hospital.  He indicated he continued to experience blurry vision and irritability, and complained of chest pain when coughing.  He was to return for follow up after an ophthamology referral, and laboratory results.  AR 211-212, 299-300.

On March 27, 2004, Plaintiff was seen in the emergency room at UMC.  He complained of blurred vision, bloody nose, cough, abdominal pain and frequent urination.  AR 187. The clinical impression was diabetic ketoacidosis and Plaintiff was admitted for treatment.  AR 188.

On April 6, 2004, Plaintiff was treated at the SAHC for complaints of increased nervousness and anger.  AR 209.  Regarding his use of alcohol - which apparently involves making wine from oranges - Plaintiff was offered a referral to a 12-step program but declined. He was prescribed medication for anxiety.  AR 209-210, 297-298.

A laboratory report from UMC dated May 4, 2004, indicates elevated glucose and ALT/AST levels.  AR 186, 296.

On May 20, 2004, Plaintiff was seen at UMC by Russell Schmidt, O.D., for a routine eye examination.  AR 184-185.

On June 15, 2004, Plaintiff was treated at the SAHC for complaints of pain in his right arm and left shoulder for the previous three days.  AR 207-208, 294-295.

On September 28, 2005, Plaintiff was seen in the emergency room at UMC, complaining of blurred vision for the previous two weeks.  AR 284.  He was counseled on the importance of control of his diabetes.  He reported that his "life is complicated and sometimes [he] didn't feel like taking [his] insulin.'"  AR 286-290.

Plaintiff was referred to UMC Opthalmology on September 30, 2005, for worsening vision. AR 275. That same day, he was also referred to UMC Urology and Surgery for evaluation regarding paraphimosis. AR 274, 276. He was also treated for diabetes on that date. AR 277-278.

On October 27, 2005, Dr. Casner completed a second comprehensive internal medicine evaluation. AR 215-217. Plaintiff was accompanied by Cleo Banks, his "roommate and landlady." His chief complaints were a severe mental disorder, back and hip pain, and poor vision. AR 215. Ms. Banks provided a history of the present illness as Plaintiff apparently did not understand why he was there, nor did he understand the doctor's simple questions. Plaintiff nodded off to sleep during the time the doctor was speaking with Ms. Banks. AR 215. Plaintiff was "listless, uncooperative, and poorly responsive verbally." AR 215. It was noted that Plaintiff is unable to bathe himself in the absence of supervision and cannot cook for himself. AR 215. On "good days" Plaintiff will help around the house with chores, but on "bad days" he sleeps, drinks, watches television and sits around. There is no limitation on sitting, and he can walk about a block. He does not drive. AR 216. At the time, Plaintiff was taking Enalapril, Famotidine, Novolin, and Ibuprofen. It was reported that he took something "for mood swings but ran out" of that medication. Dr. Casner noted Plaintiff was poorly groomed, casually dressed, and "malodorous." He spoke little and poorly, and was in no acute distress. His affect was apathetic or bewildered when he was not sleeping. AR 216. It was noted that Plaintiff's breath smelled of alcohol and Ms. Banks apparently indicated that Plaintiff took "'a couple of swigs'" prior to the appointment. AR 216. His posture was fair, but his gait was slow and clumsy. He was unable to cooperate during the exam because he was sleepy and unable to follow verbal commands. Plaintiff had no assistive device with him at the time but apparently uses a cane when his hip bothers him. Dr. Casner's diagnoses indicated a "mental status change[], possibly due to alcohol or other substance abuse, mental illness, or poorly treated diabetes." It also noted "schizophrenia, by history" as well as diabetes and hypertension. The doctor could not assess the number of hours Plaintiff might be capable of standing and walking in an eight-hour workday. Plaintiff could sit without restriction with a break every two hours. He

9

was limited environmentally from walking distances and using stairs, and was to avoid heights and open machinery. AR 217.

Also on October 27, 2005, Plaintiff saw Dr. House for another comprehensive mental status evaluation and psychological examination. AR 218-221. He appeared disheveled as his grooming and personal hygiene were poor. He was accompanied by his "girlfriend." His eyes remained closed for most of the consultation, and he had been observed to be snoring and sleeping deeply in the reception area. His girlfriend completed the psychological questionnaire, trying to arouse Plaintiff in order to escort him into an examination room. Plaintiff's gait was unsteady and he appeared confused, dazed and disoriented. Dr. House suspected the Plaintiff was using drugs, but Plaintiff's girlfriend denied drug use and indicated instead that Plaintiff slept all the time. AR 218. She told the doctor she had lived with Plaintiff for the previous ten years and that he had deteriorated in appearance, personal hygiene and mental abilities. AR 218. Through his girlfriend, Plaintiff's chief complaints were recorded as hearing voices all the time, a belief that the devil is coming to get him because he believes he is dying, an inability to care for himself, poor health and an inability to earn a living. AR 219. Plaintiff's girlfriend acknowledged his history of drug and alcohol abuse, and admitted "that he still 'uses a little.'" AR 219. Dr. House noted that Plaintiff was asleep, snoring and unresponsive. His speech was nonexistent during the examination. Thus, Plaintiff's content of thought and mood, as well as insight and judgment, concentration, and memory function could not be determined. AR 219-220. Psychological testing could not be completed. AR 219. It was noted that Plaintiff's social problem solving skills are markedly impaired. On this occasion, Dr. House's DSM-IV diagnoses included: a polysubstance abuse disorder and psychotic disorder NOS, from history, in Axis I; diabetes, high blood pressure, back and knee problems in Axis III, a lengthy history of drug abuse and marginal adjustment to life in Axis IV, and a GAF of 45 in Axis V. AR 220. Dr. House believed the prognosis was poor for Plaintiff's polysubstance abuse and psychotic disorders. AR 220.

On October 31 and December 12, 2005, Plaintiff was treated for diabetes at UMC. Adjustments were made to his medications on the latter occasion. AR 272-273.

A December 21, 2005, a psychiatric review by M.O. Nawar found insufficient evidence of Plaintiff's medical disposition. AR 222.

Plaintiff was treated for insomnia and back and knee pain at UMC on March 21, 2006. It was noted Plaintiff was "seeking disability." AR 263-264. X-rays of Plaintiff's right knee established severe degenerative joint disease between the medial and patello-femoral joint spaces. AR 265. With regard to his lumbar spine, changes of degenerative disc disease and facet arthropathy were seen at the L4-5 and L5-S1 levels. AR 266.

A lab report dated April 4, 2006, from UMC indicates elevated glucose and ALT/AST levels. AR 260.

A May 3, 2006, Physical Therapy Initial Evaluation and Treatment Plan form indicates a diagnosis of severe degenerative joint disease in the right knee. Electric stimulation, gait/stair training, therapeutic exercise, as well as a home exercise program, were recommended. AR 258. It was noted that Plaintiff's gait was abnormal, and his muscle strength and range of motion were limited. AR 259.

On June 13, 2006, Plaintiff complained of back and knee pain and was treated at UMC. X-rays were taken of his knee and spine. AR 255.

A lab report dated June 21, 2006, from UMC indicates elevated glucose and ALT/AST levels, among others. AR 253.

On September 26, 2006, Plaintiff was seen at the adult clinic at UMC for a follow up regarding back and knee pain. He prescription medications were refilled, and it was noted that he had no new complaints. Plaintiff apparently indicated that he traded medications with a friend, receiving Vicodin in return, and believed it to be more effective. AR 251.

On September 29, 2006, Plaintiff was treated for back pain with cough at the emergency room at UMC. AR 245. He also complained of right knee pain and was using a cane. However, before he could be seen by a doctor, Plaintiff left the hospital, advising a nurse that he was tired of waiting to be seen. AR 247.

A lab report dated October 4, 2006, from UMC indicates elevated glucose and ALT/AST levels, among others. AR 249.

On October 24, 2006, Plaintiff was seen at UMC for complaints of back and knee pain. AR 237, 240. His knee would lock if standing for a long period of time. He also complained of continued impotence. AR 240. A related lab report evidences high glucose and ALT/AST levels. AR 238.

On February 13, 2007, Leng Ky, M.D., completed a Multiple Impairment Questionnaire following examination of Plaintiff. AR 311-318. Dr. Ky diagnosed degenerative joint disease of the right knee and degenerative disk disease in the spine, diabetes mellitus type II and obesity. He noted mild improvement of symptoms with weight loss and control of diabetes. AR 311. Paraspinal tenderness was noted with palpitation, as were pain with back extension and right knee movement. AR 311. Plaintiff's primary symptoms were identified as lower back pain, difficulty ambulating, gait abnormality, knee pain and loss of sensation in his feet, and mild fatigue. AR 312. Dr. Ky believed Plaintiff's symptoms to be reasonably consistent with Plaintiff's physical or emotional impairments. Plaintiff indicated his pain was achy and occasionally sharp with muscle cramping in his back and right knee. AR 312. He indicated the pain was constant and increased with activity. The doctor noted that another factor relating to Plaintiff's pain was obesity. AR 313. The doctor placed Plaintiff's pain at a 6 on a scale of zero to ten, and his fatigue at a 3 on a scale of zero to ten. AR 313. In an eight-hour day, Dr. Ky opined Plaintiff could sit for 3 hours, and stand or walk for 1 hour. He should not sit continuously and should get up and move around every thirty minutes. AR 313. Neither should Plaintiff stand continuously in a work setting. AR 314. The doctor noted that Plaintiff could frequently lift and carry 5, 10 or 20 pounds, occasionally lift and carry between 20 and 50 pounds, but never lift and carry over 50 pounds. AR 314. Minimal limitations or no limitations were noted for manipulation in a workplace setting. AR 314-315. Plaintiff's prescription medications were recorded as: Enalapril, Famotidine, HCTZ, Mefformin, Novolin and Tylenol 3. AR 315. Dr. Ky opined that Plaintiff's symptoms would likely increase if he were placed in a competitive work environment. AR 315. The doctor noted that Plaintiff's pain, fatigue or other symptoms were seldom severe enough to interfere with his attention and concentration. AR 316. Emotional factors do not contribute to the severity of Plaintiff's symptoms or functional

limitations.  AR 316.  The doctor did not believe Plaintiff was a malingerer, and believed Plaintiff could handle moderate work-related stress.  Specifically, the doctor noted that Plaintiff "does not have psychological barriers related to work."  AR 316.  Plaintiff should never push, pull, kneel, bend or stoop at work.  AR 317; see also AR 319-322.

On May 30, 2007, Plaintiff was treated for knee and back pain and diabetes.  He was coughing continuously.  His diabetes was poorly controlled, and he was prescribed an Albuterol inhaler to treat his cough.  A history of family asthma was noted.  AR 326-328.

ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 9, 2004.  Further, the ALJ found that Plaintiff had the severe impairments of degenerative joint disease of the right knee, degenerative disc disease and facet arthropathy of the lumbar spine, and polysubstance disorder.  Nonetheless, the ALJ determined these severe impairments did not meet or equal any listing impairments so as to result in a disability finding.  AR 21.

Based on his review of the medical evidence, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to lift and carry twenty-five pounds frequently and fifty pounds occasionally, and to stand, walk and sit six hours in an eight-hour workday, with the ability to occasionally climb, balance, stoop, kneel, crouch and crawl.  AR 22-24.

Given this RFC, and the fact that Plaintiff had no past relevant work experience, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy.  The ALJ considered the fact that Plaintiff was "'closely approaching advanced age'" at the time of the hearing, and that he had a limited education.  AR 24-25.  Relying on the testimony of the VE, the ALJ found that Plaintiff could perform unskilled, sedentary work, in positions that exist in significant numbers in the national economy.  AR 25.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

1  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v.*

2  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a

3  reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at

4  401. The record as a whole must be considered, weighing both the evidence that supports and

5  the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993,

6  995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must

7  apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

8  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

9  Commissioner applied the proper legal standards, and if the Commissioner's findings are

10  supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d

11  509, 510 (9th Cir. 1987).

12  **<u>REVIEW</u>**

13      In order to qualify for benefits, a claimant must establish that he is unable to engage in

14  substantial gainful activity due to a medically determinable physical or mental impairment which

15  has lasted or can be expected to last for a continuous period of not less than twelve months. 42

16  U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of

17  such severity that he is not only unable to do her previous work, but cannot, considering his age,

18  education, and work experience, engage in any other kind of substantial gainful work which

19  exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

20  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

21  Cir. 1990).

22      In an effort to achieve uniformity of decisions, the Commissioner has promulgated

23  regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

24  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[6] Applying this process in this case, the ALJ

25  found that Plaintiff: (1) had not engaged in substantial gainful activity since March 2004; (2) has

26  an impairment or a combination of impairments that is considered "severe" based on the

27

28      [6]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4, and (a) has the RFC to perform unskilled medium work with occasional postural limitations; (4) has no past relevant work; (5)(a) is 51 years old, (b) has a limited education and is able to communicate in English, (c) has no transferability of job skills because of a lack of past relevant work, and (d) given his age, education, work experience and RFC, Plaintiff can perform jobs that exist in significant numbers in the national economy. The ALJ concluded that Plaintiff is not disabled. AR 19-25.

Here, Plaintiff argues that (1) the ALJ committed error in rejecting significant aspects of the examining and treating source opinions to find Plaintiff did not suffer from a severe mental impairment at step two, and (2) the ALJ erred in rejecting the opinion of Plaintiff's treating physician, Dr. Ky.

## DISCUSSION

### The ALJ's Assessment at Step Two

Plaintiff argues that the ALJ erred in rejecting or ignoring significant aspects of examining or treating opinions, thus finding Plaintiff's mental impairment was not severe at step two. Defendant contends substantial evidence supports the ALJ's findings.

At step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a severe, medically determinable physical or mental impairment or combination of impairments, that meets the twelve-month duration requirement. 20 C.F.R. §§ 404.1520(a)(4)(h) & (c), 416.920; SSR 96-3p; *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5 (1987). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Yuckert,* at 154, n. 11.

Examples of basic work activities include carrying out simple instructions, responding appropriately to usual work situations, dealing with changes in a routine work setting, and performing ordinary physical functions like walking and sitting. 20 C.F.R. § 404.1521(b).

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at step two if the medical evidence establishes only a slight abnormality or a

combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). SSR 85-28. In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basis work activities. SSR 96-3p.

"The regulations guiding the step-two determination of whether a disability is severe is merely a threshold determination of whether the claimant is able to perform his past work. Thus, a finding that a claimant is severe at step two only raises a prima facie case of a disability." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007).

Here, with regard to the finding of severe impairments at step two, and specifically with regard to Plaintiff's allegation of schizophrenia, the ALJ stated that Plaintiff

> has received no psychiatric therapy or mental health counseling for schizophrenia. He currently is not prescribed any medication for a psychotic disorder (Exhibit 14E, p. 2). Therefore, I find . . . schizophrenia [a] non-severe impairment[] that do[es] not cause more than minimal limitation[] on his ability to perform work-related activities.

AR 21.

Appellant's argument is not persuasive. Dr. Casner did not specifically address Plaintiff's ability to perform basic work activities. The doctor's notation that "[h]earing and speaking are limited by mental impairment and somnolence" (AR 217) specifically references a limitation rather than a preclusion or inability. *Cf. Edlund v. Massanari*, 253 F.3d 1152, 1158-1159 (9th Cir. 2001) (uncontradicted psychological report finding only fair or poor abilities).[7]

---

[7]Notably too, in *Edlund*, the court noted that the ALJ's hypothetical questions posed to the VE did not take into consideration Edlund's mental impairment, and thus the RFC finding was flawed. *Edlund v. Massanari*, 253 F.3d at 1160. Here however, Plaintiff's representative specifically asked the VE to consider whether a "difficulty interacting appropriately with coworkers and the general public" and a "difficulty completing a normal workday because of a personality disorder which is disruptive, antisocial and contentious" (AR 344) would result in finding of the hypothetical worker's inability to perform jobs in the national economy.

Dr. House's most recent report indicates the doctor could not assess Plaintiff's ability to perform basic work activities because Plaintiff was sleeping and uncooperative. Additionally, Dr. House was concerned Plaintiff was under the influence of a drug. More particularly, regarding Plaintiff's ability to respond appropriately to supervision or interact in an appropriate way with coworkers and the general public, Dr. House wrote "Undetermined." AR 220.

Plaintiff's reliance on *Regennitter v. Commissioner of Soc. Sec. Admin.*, 166 F.3d 1294 (9th Cir. 1999) is misplaced. That case is factually distinguishable from the instant case. Most significantly, in *Regennitter*, there was "no affirmative evidence that [the plaintiff] was malingering." *Id.*, at 1296. Here however, several tests administered by Dr. House established that Plaintiff was malingering, and trying to skew the results of those tests with his responses. AR 175-178. Moreover, in *Regennitter*, the medical record established that plaintiff "received treatment on thirty-two occasions during the five years prior to his second hearing" (*id*., at 1296) and that his failure to seek additional treatment was explained by his "uncontested explanation [that] . . . he could not afford it." *Id.*, at 1296. In this case, there is a significant lack of related treatment, and there was no indication that the reason Plaintiff was not being treated for the condition was due to a lack of funds. Plaintiff continued to receive treatment for diabetes and his back and knee pain, yet he did not obtain mental health treatment. In *Regennitter*, the record established that the plaintiff could rarely afford prescription medications and that he regularly compensated for that by "overdosing on large quantities of over-the-counter pain medication." *Regennitter*, at 1297. There is no indication that Plaintiff here had difficulty affording his prescription medications. In fact, Plaintiff was taking no less than four prescriptions to treat his other conditions. AR 216. Finally, in *Regennitter*, the ALJ improperly relied upon the fact he "determined that Regennitter's complaints are 'inconsistent with clinical observations,'" but he failed to specify what complaints were contradicted by the clinical observations, and his own speculation that Regennitter had chosen to live a sedentary lifestyle. *Regennitter*, at 1297-98. The facts of Regennitter are clearly distinguishable.

Plaintiff takes issue with the ALJ's purported failure to "specifically address the mental assessments rendered by Dr. Casner." As pointed out by the Commissioner however, because

Dr. Casner's findings were contradicted by Dr. House and the state agency physicians, the ALJ could properly reject Dr. Casner's opinion to the degree it was contradictory. The ALJ is responsible for resolving conflicts in the medical evidence. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Indeed, the court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Id.*

The record in this case is sparse with regard to any evidence of a mental health condition, and the only reference to schizophrenia comes from Plaintiff himself. Plaintiff successfully sought medical treatment for a variety of ailments. Plaintiff's assertion that he suffers from schizophrenia does not amount to "medical evidence" that establishes something more than a minimal effect on one's ability to perform basic work activities. *Smolen v. Chater*, 80 F.3d 1272, 1290 (9th Cir. 1996).

Plaintiff complains that the ALJ did not address the significance of Dr. House's GAF assessments and assigns error thereto. Defendant counters that Dr. House was unable to assess Plaintiff's mental functional limitation and thus, assuming relevance, the GAF score was unreliable. "The GAF score is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of an individual's overall level of functioning. A score of 50 indicates 'serious symptoms . . . [or] serious impairment in the social, occupational, or school functioning.'" American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. The Commissioner has determined the GAF scale "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." 65 Fed.Reg. 50,746, 50,765 (Aug. 21, 2000).

Finally, the Court notes that Plaintiff did not testify about his purportedly severe mental condition at the hearing. It appears that his representative commenced examination of Plaintiff with this line of questioning, but failed to elicit any meaningful testimony. *See* AR 336. It is Plaintiff's burden to prove that he is disabled. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999).

The ALJ's determination that Plaintiff did not suffer from a severe mental impairment is supported by substantial evidence and the proper legal standards were applied.

### *The Report of Leng Ky, M.D.*[8]

Plaintiff complains the ALJ committed significant legal error in rejecting the RFC opinions of Dr. Ky, Plaintiff's treating internist. Defendant asserts that Dr. Ky was not Plaintiff's treating physician, and even if he were, the ALJ provided valid reasons for discounting the doctor's opinion because Dr. Ky treated Plaintiff on only one occasion and had not treated Plaintiff for orthopedic complaints.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion an examining physician over that of a treating physician. "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not '"substantial evidence."' *Orn,* 495 F.3d at 632; *Murray*, 722 F.2d at 501-502. "By contrast, when an examining physician provides 'independent clinical findings that differ from the findings of the treating physician' such findings are 'substantial

---

[8]*See* fn. 4, *ante*.

evidence.'" *Orn*, 496 F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985).

Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not herself considered, *see Andrews*, 53 F.3d at 1041.

If a treating physician's opinion is not giving controlling weight because it is not well supported or because it is inconsistent with other substantial evidence in the record, the ALJ is instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. 404.1527(d)(2)(i)-(ii). Other factors include the supportablility of the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6). Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference." SSR 96-2p; *Orn*, 495 F.3d at 632-633. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn*, 495 F.3d at 633.

The opinion is question is dated February 13, 2007, and was completed on a form entitled "Multiple Impairment Questionnaire." See AR 311-318. On the first page, with regard to Question 1, Dr. Ky did not provide an answer for "Date of first treatment" nor did he provide a response to "Frequency of treatment." Regarding the form itself, it may have been reasonable for the ALJ to infer from the absence of this information that Dr. Ky's treatment of Plaintiff was limited to the examination that accompanied the completion of the form. *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to draw inferences logically flowing from the evidence). This inference was bolstered by Plaintiff's testimony at the administrative hearing that he could not recall Dr. Ky specifically, and that his treating physicians

1  varied greatly because he was treated at a "training facility."  See AR 339-340.  At the hearing,

2  the following colloquy occurred:

3         Q.  Is Dr. Kay a doctor who treats you regularly?
4         A.  You know, I done had so many different doctors.  Well, I mean where I go, it's
       a training facility, and they have so many in there, I might go in and have this doctor for
5       two or three times that I go in; and next time, it be somebody else.  So, I can't really tell
       you who's who.
6         Q.  Okay.  You don't remember Dr. Kay, then, one way or another?
       A.  It depends on what hospital it was in.  I mean, where was he at?
7         Q.  All I know, is that it was at 445 Cedar on - -
       A.  That's, that's the training facility where I go.  I mean, there, I can remember
       some of the doctors' names.
8         Q.  I believe that's at UMC Hospital.
       A.  Yeah, UMC.  That's where I go.  They change doctors so much, so I can't
9       keep track of the names.
       Q.  So you wouldn't know how many times Dr. Kay personally had seen you,
10      would you as opposed to somebody else?
       A.  I'm trying to remember Dr. Kay.
11      Q.  Did you see anybody for diabetes there?
       A.  Yeah.  That's what I go for, diabetes and my back and my leg.  Sometime my
12      doctor not in there, then they put somebody in there for a while, and then, you know, this
       last, this last time that I been in, the longest one I knew was the last doctor right now.
13      And, I been with him about a year now, since last, I think, July.
       Q.  Do you remember his name?
14      A.  - - come on, put it down on that paper.
       Q.  Right here?
15      ALJ:  Doctor DiSohn.
       ATTY:  Your Honor, I think he sees several different doctors there.  It's really
16      hard to pin, pin down exactly how many times he's seen this person.
       ALJ:  Okay.

17

18  AR 339-340.  Nevertheless, the record conflicts with the ALJ's findings.

19         The Regulations define a "treating" physician as a physician who has provided medical

20  treatment or evaluation and "who has, or has had, an ongoing treatment relationship with" the

21  claimant.  20 C.F.R. § 404.1502.  This Court's review of Plaintiff's medical records from UMC

22  indicates treatment of Plaintiff by Dr. Leng Ky on four occasions: September 26 and October 24

23  of 2006, and February 13 and May 30 of 2007.  *See* AR 240, 251, 321, 326.  Also, Dr. Ky is

24  listed as Plaintiff's "Primary MD" on Outpatient Registration forms.  *See* AR 237, 243, 248,

25  283.[9]

26

27         [9]Plaintiff testified that he was treated at the "training facility."  AR 339.  This may account for Outpatient
Registration forms that reflect "no primary" physician on occasion.  *See* AR 252, 256, 271, 301.  The Court notes
28  that a "Teaching Program" is also referenced at AR 301.

The ALJ stated that the "record shows that Dr. Leng [*sic*] examined Mr. Coleman only once and not for any orthopedic complaints. Thus, [the doctor's] opinion is not entitled to any special deference, and I give it little weight." AR 23. However, the record, as noted above, establishes that Dr. Ky treated Plaintiff on at least four occasions, three of which occurred prior to or concurrent with Dr. Ky's report. Additionally, the ALJ's statement that Dr. Ky did not treat Plaintiff "for any orthopedic complaints" is erroneous. On September 26, 2006, Plaintiff complained of back and knee pain. His medications were refilled and Celebrex was prescribed. AR 251. On October 24, 2006, Dr. Ky treated Plaintiff for back and knee pain. He recommended "appropriate analgesics" for Plaintiff's right knee pain, and pain management. AR 240.

If an ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Orn v. Astrue*, 495 F.3d at 632. Here, because the ALJ erroneously concluded that Dr. Ky had treated Plaintiff on only one occasion, and never for orthopedic complaints, the ALJ failed to set forth specific, legitimate reasons for disregarding Dr. Ky's opinion. Dr. Ky had treated Plaintiff on at least four occasions, including treatment of Plaintiff's complaints regarding back and knee pain.

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has

been thoroughly developed.").  Here, the Court has determined that the ALJ did not provide specific and legitimate reasons supported by substantial evidence in rejecting Dr. Ky's opinion. Further proceedings are therefore required to allow the ALJ to re-analyze the opinion, consistent with the Ninth Circuit's opinion in *Orn v. Astrue*, 496 F.3d 625.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Eldee L. Coleman and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:    May 22, 2009**          _____**/s/ Gary S. Austin**_____
                                                  UNITED STATES MAGISTRATE JUDGE